**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| R. P. SMALL CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No.: 4:20-cv-01490 |
| v. | § | |
| | § | |
| THE LAND DEPARTMENT, INC.; | § | |
| CYPRESS ROCK LAND SERVICES, | § | |
| LLC; FIVE STAR PETROLEUM, LLC; | § | JURY TRIAL DEMANDED |
| AND MICHAEL H. MANN, | § | |
| | § | |
| Defendants. | § | |

**R. P. SMALL CORP.'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
R. P. SMALL CORP.'S THIRD AMENDED COMPLAINT**

i

## <u>TABLE OF CONTENTS</u>

I.     NATURE AND STAGE OF THE PROCEEDING............................................................1

II.    FACTUAL BACKGROUND ........................................................................................2

III.   SUMMARY OF THE ARGUMENT ............................................................................10

IV.   RULE 9(B) & 12(B)(6) STANDARDS......................................................................11

      A.    FAIR NOTICE AND SPECIFICITY REQUIREMENT – RULE 9(B) ...................................11

      B.    REQUIREMENT TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED – RULE 12(B)(6).....................................................................................12

V.    ARGUMENTS AND AUTHORITIES.............................................................................13

      A.    RPS PLED SUFFICIENT FACTS TO SUPPORT ITS BREACH OF FIDUCIARY DUTY AND FRAUD BY NONDISCLOSURE CLAIMS AGAINST MANN.........................13

      B.    RPS PLED SUFFICIENT FACTS TO SUPPORT ITS CLAIMS AGAINST MANN, TLD AND CYPRESS FOR TORTIOUS INTERFERENCE WITH THE FIVE STAR DRILLING CONTRACT.....................................................................................14

      C.    RPS PLED SUFFICIENT FACTS TO SUPPORT ITS ALTER EGO CLAIMS AGAINST MANN ...................................................................................................19

      D.    SECTION 21.223 DOES NOT APPLY TO MANN'S ACTIONS TAKEN IN HIS PERSONAL CAPACITY................................................................................20

CONCLUSION.........................................................................................................21

# **TABLE OF AUTHORITIES**

## ***Cases***

*Bell Atl. Corp. v Twombly*,
    550 U.S. 544 (2007)...........................................................................................12

*Campbell v. Wells Fargo Bank*,
    781 F.2d 400 (5th Cir. 1986) .........................................................................11

*Conley v. Gibson*,
    355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).............................................13

*Erickson v. Pardus*,
    551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)(per curiam)...............11

*Frith v Guardian Life Ins. Co. of America*,
    9 F.Supp.2d 734 (S.D. Tex. 1998) ................................................................12

*Home Builders Association of Mississippi, Inc. v. City of Madison, Miss.*,
    143 F.3d 1006 (5th Cir.1998) ........................................................................13

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) .........................................................................12

*Mahone v. Addicks Util. Dist. Of Harris County*,
    836 F.2d 921 (5th Cir.1988) ..........................................................................13

*Malina v. Gonzales*,
    994 F.2d 1121 (5th Cir. 1993) .......................................................................12

*Powell Industries, Inc. v. Allen*,
    985 S.W.2d 455 (Tex. 1998)..........................................................................15

*Rosenzwieg v. Azurix Corp.*,
    334 F.3d 854 (5th Cir. 2003) .........................................................................11

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp.3d 650 (N.D. Tex. 2017) ...........................................................11

*United States ex rel. Johnson v. Shell Oil Co.*,
    183 F.R.D. 204 (E.D. Tex. 1998)...................................................................12

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) .........................................................................11

*Weatherford Int'l LLC v. Binstock,*
    CV-H-19-4258, 2020 WL 1692543, at *8 (S.D.Tex. April 7, 2020)............................ 14-16

### *Rules and Statutes*

Federal Rule of Civil Procedure 8 ................................................................................11

Federal Rule of Civil Procedure 9 ...................................................................2, 11-12, 14, 19-21

Federal Rule of Civil Procedure 12 .......................................................................... 11-14, 19, 21

Texas Bus. Org. Code. §21.223 ................................................................................11, 20

### *Other Authorities*

Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1291 (1st ed.1969).....................12

Plaintiff R. P. Small Corp. ("RPS") files this Response to Defendants' Motion to Dismiss R. P. Small Corp.'s Third Amended Complaint (Dkt. 55) filed by The Land Department, Inc. ("TLD"), Cypress Rock Land Services, LLC ("Cypress") and Michael H. Mann (collectively "Mann Defendants").

## I.
## <u>NATURE AND STAGE OF THE PROCEEDING</u>

On April 27, 2020, RPS filed its Original Complaint.  (Dkt. 1).  The Mann Defendants filed a Motion to Dismiss the Original Complaint.  (Dkt. 9).  RPS filed a First Amended Complaint (Dkt. 13) and a Response to Defendants' Motion to Dismiss.  (Dkt. 10).  The Mann Defendants filed a Motion to Dismiss RPS's First Amended Complaint.  (Dkt. 17).  In response, Plaintiff filed a Second Amended Complaint.  (Dkt. 21).  On July 22, 2020, the Court granted RPS leave to amend its Complaint and denied Defendant's Motion to Dismiss as moot.  (Dkt. 29).  On August 5, 2020, the Mann Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint. (Dkt. 34).  On August 26, 2020, Plaintiff filed its response.  (Dkt. 40).  On December 7, 2020, the Court issued a 56-page Memorandum Opinion and Order granting in part and denying in part Defendants' Motion.  (Dkt. 48).  The Court's Memorandum Opinion provided a roadmap to RPS to amend certain claims.  On January 11, 2021, following that roadmap, RPS filed its Third Amended Complaint (Dkt. 53).  On February 2, 2021, Defendants filed another Motion to Dismiss (Dkt. 55), to which RPS now responds.

With the Court's permission, RPS seeks leave to file the attached Proposed Fourth Amended Complaint dismissing the following claims (1) Breach of Oral Agency Contract Claim against Mann; (2) Fraudulent Inducement against Mann and TLD; (3) Fraud; and (4) Violation of

the DTPA.[1]  RPS seeks to proceed only on the following claims: (1) Breach of Written Contract Against TLD and Cypress; (2) Breach of Fiduciary Duty Against Mann; (3) Fraudulent Inducement Against Cypress[2]; (4) Fraud by Nondisclosure Against Mann; (5) Tortious Interference Against Mann, TLD, and Cypress; and (6) Alter Ego Against Mann.  Defendants' Motion to Dismiss challenges the sufficiency of RPS's pleadings as to the following remaining causes of action only: (1) Fraud by Nondisclosure against Mann under Rule 9(b); (2) Tortious Interference against Mann, TLD and Cypress; and (3) Alter-ego against Mann.  RPS will address each of those challenges in this response.

**II.**
**FACTUAL BACKGROUND**

Richard P. Small ("Mr. Small"), President of RPS, met Michael H. Mann ("Mr. Mann") over twenty years ago.  (Dkt. 53, ¶8).  The two men began working together on business dealings and became good friends.  *Id.* at ¶10.  As Mr. Small grew older, he relied more and more on the younger Mr. Mann to handle transactions and make business decisions in their joint undertakings.  *Id.*  Mr. Small trusted Mr. Mann.  *Id.*

In late 2016, Mr. Mann conceived the idea to develop a wildcat (exploratory) well in Walker County after learning about some leases for sale in that area.  *Id.* at ¶ 11.  On January 1, 2017, RPS signed a written contract with The Land Department ("TLD").  *Id.* at ¶12.  <u>TLD was (and if it exists still is) wholly-owned and operated by Mr. Mann.</u>  *Id.*  TLD agreed in the written contract to provide landman services, which often involves finding and acquiring leases and mineral rights.  *Id.*  Landman services can also include negotiating and preparing contracts on

---

[1] Exhibit A: Proposed Fourth Amended Complaint.  No new factual allegations have been added; causes of action only have been removed.

[2] Defendants admit that RPS's complaint is sufficient to state a claim against Cypress for fraudulent inducement.

behalf of the company.  *Id.*  Under the terms of the TLD Agreement, defendant TLD represented the following:

> TLD ["The Land Department, Inc."] represents that it is in the business of providing petroleum land services to the oil and gas industry.  These services **include, but are not limited to**, reviewing the public records to determine current ownership of the surface estate and/or the underlying mineral estate of target tracts (the "Prospect Area"), obtaining attorney's title opinions, bargaining for and/or acquiring oil, gas and mineral leases, easements, etc. from the owners thereof and performing **other related services**.[3]

*Id.* at ¶13 (emphasis added).  The "Prospect Area" was defined as certain "tracts of land located in Walker and San Jacinto Counties, Texas.  *Id*.  Plainly, the TLD Agreement was meant to encompass services beyond basic landman services – especially if the company had (or represented it had) experience and expertise in providing those services.  *Id.*

Shortly after entering into the TLD Agreement (1/1/17), Mann orally represented that both he and TLD had the necessary expertise, beyond landman services, to handle all of the responsibilities of the Operator of the Norma #1.  *Id.* at ¶14.  An "Operator" is the overall manager and decision-maker of a drilling project.  RPS is licensed to serve as an Operator of oil and gas wells.  *Id*.  The exact duties of "Operator" on the project at issue were specified in the Joint Operating Agreement prepared by TLD on behalf of RPS.  *Id.* at 23.  Neither Mann, TLD, nor Cypress possessed the necessary license to act as an Operator of oil and gas wells.  *Id.* at ¶14. Mann assured RPS that he personally and TLD had the requisite expertise to serve as the Operator's *agent* of the Norma #1 well.  *Id.*  Mann knew at the time his representations were false. *Id*.  In actuality, and unbeknownst to Small, neither Mann nor TLD's employees had *any* experience acting as Operators, and were utterly incapable of competently managing oil and gas operations.  *Id.*

---

[3] Dkt. 53-1, Page 1, 2nd ¶ (emphasis added).

Small and Mann had extensive communications <u>via telephone and email</u> regarding the process for developing the well and Mann and TLD's agency roles in that process.  *Id.* at ¶15. These communications typically occurred by telephone or email with Mann in <u>Houston</u>, Texas and Small in <u>Tulsa</u>, Oklahoma.  *Id.*  Occasionally, Mann was located in <u>Walker County</u>, Texas during these electronic communications.  *Id.*

Based on their long-time relationship, Mann and Small frequently did business orally rather than repeatedly drafting and executing separate written contracts.  *Id.* at ¶16.  For example, after TLD had completed the required process of obtaining a title or lease for oil, gas, and minerals on other projects before the Trinity Bend Prospect Area, TLD and Mann worked on joint venture proposals, conducted meetings with joint venturers, and undertook drilling projects on behalf of RPS.  *Id.*

Mann took advantage of his longtime personal and professional relationship with Small and made false representations about his and TLD's expertise with the clear intent that RPS rely on the representations and enter into an agency agreement with him personally and with his company TLD (and later his company Cypress).  *Id.* at ¶17.  Mann and TLD (and later Cypress) took advantage of this agency agreement to engage in self-dealing and overbilling.  *Id.*  Mann and TLD orally agreed to abide by the terms of the JOA (which was prepared by TLD) and outlined the specific Operator duties Mann and TLD would execute as agents for RPS.  *Id.* at ¶¶ 24-26.  The parties agreed that TLD and Mann would be compensated at the same rates set forth in the TLD Agreement for these additional related services.  *Id.* at ¶26.

RPS relied upon Mann's and TLD's false representations and trusted Mann and TLD to act as RPS's agent.  *Id.* at ¶28.  Mann was authorized by RPS to act on RPS's behalf to transact business and manage operations of the oil and gas wells in the Trinity Bend Prospect.  *Id.*  TLD,

by virtue of the TLD Agreement, was also authorized to act on RPS's behalf to transact business and manage operations of the oil and gas wells in the Trinity Bend Prospect. *Id.*

On **July 17, 2017**, Mann, acting with RPS's authority as its agent, executed a drilling Master Services Agreement ("Drilling Contract") between RPS and Five Star Petroleum, LLC ("Five Star").[4]  *Id.* at ¶19.  Small relied on Mann's intentional misrepresentations that Five Star was competent and qualified to perform the drilling contract in authorizing Mann to enter into the Drilling Contract on behalf of RPS.  *Id.* at ¶20.  Mann executed the contract in his individual capacity on behalf of RPS.  *Id* at ¶19.  Under the terms of the Drilling Contract, Five Star was to be compensated by RPS for drilling a well on the Trinity Bend Prospect with the following limitation: "[I]n no event shall the compensation be greater than that normally charged by Contractor [Five Star] for similar work or services."[5]  *Id.*

After the majority of the leases were obtained, Small brought together business associates to fund the drilling of the Norma #1 Well on the Trinity Bend Prospect.  *Id.* at ¶21.  In late 2017 and early 2018, RPS and its business partners entered into a Joint Venture Agreement ("JVA") and a Joint Operating Agreement ("JOA") to develop the Norma #1 well.  *Id.* at ¶22.  The JVA and JOA were drafted by TLD employee Rex Bennett, who is a licensed Texas attorney.  *Id.* Mann and TLD were fully aware of and understood the scope of their respective agreements with RPS, as evidenced by the fact that TLD itself drafted the document which outlined RPS's obligations as Operator in the JOA.  *Id.* at ¶29.

The JOA designated RPS as the Operator of the Trinity Bend Prospect.[6]  The other investors were designated as "nonoperators."  *Id.* at ¶24.  The specific duties of the Operator were

---

[4] Dkt. 53-2.
[5] Dkt. 53-2 at p. 2, ¶ 2.1 (emphasis added).
[6] *Id.* at p.1.

listed in the JOA. *Id.* at ¶24. The duties included in the TLD-drafted JOA were the exact same duties discussed by Mann and Small, the same duties which Mann assured Small that he and TLD had experience to handle. *Id.* at ¶25. Unbeknownst to RPS, his agreement with Mann to compensate Mann and TLD at the rates outlined in the TLD Agreement was in violation of the terms of the TLD-drafted JOA which provides: "All wells drilled on the contract area shall be drilled on a competitive contract basis at the usual rates prevailing in the area...All work performed or materials supplied by affiliates or related parties of operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry." Dkt. 53-3 at pg. 12.

Mann and TLD (which later became Cypress) had obligations to perform professionally and competently, including, but not limited to, managing the operations of the wells, appropriately handling the joint interest billing and invoicing, and ensuring regulatory compliance. Dkt. 53 at ¶31. TLD (and later Cypress) also agreed to adhere to COPAS (Counsel of Petroleum Accountants Societies) Procedures. *Id.* at ¶32. TLD (and later Cypress) consistently failed to comply with COPAS Procedures as required by the JOA. *Id.* at ¶ 33. Specifically, TLD (and later Cypress) issued redundant cash calls and JIBS for the same invoices and expenses, did not properly account for money collected in the cash calls and the JIBs, over-billed administrative tasks, and failed to follow the limits and billing exclusions outlined in the COPAS procedures. *Id.* These failures resulted in massive overbilling. *Id.*

TLD (and later Cypress) issued cash calls to each of the JOA participants for the estimated costs to be charged by certain vendors. *Id.* at ¶35. RPS paid every cash call it received. *Id.* When the invoices were received from the vendors, TLD failed to properly reconcile the amount paid by RPS and issue credits for payments previously made. *Id.* Instead, TLD issued multiple cash

calls for the same work – each of which RPS promptly paid. *Id.* When the invoices were received for that work, Mann and TLD (later Cypress) failed to credit RPS's account for those payments and issue proper JIBs to RPS. This resulted in RPS paying several invoices two and three times over. *Id.*

Mann, TLD and Cypress's flagrantly improper accounting practices created tremendous dissonance among the JOA participants such that many of the JOA participants refused to pay their portion of the expenses in breach of the JOA. *Id.* at ¶ 38. Several JOA participants chose not to participate in the sidetrack project proposed by Mann based on his assurances of success. *Id.* at 37. This refusal to consent and participate by certain participants resulted in RPS having to pay more than its fair share of the expenses. *Id.*

By invoicing RPS two and three times for the same work, Mann breached his fiduciary duty to RPS and Mann and TLD (and later Cypress) breached their agency contract with RPS. *Id.* at ¶39. By accepting payment for duplicate invoices, knowing the amounts billed were not actually due, TLD (and later Cypress) committed fraud.

Mann and TLD commingled TLD funds with funds provided by RPS's Operator account that were supposed to be used exclusively for operations under the terms of the JOA. *Id.* at ¶ 40. Mann comingled funds received from nonoperators with those of other entities for whom Mann had banking authority. *Id.* at ¶41. Mann used the funds obtained by virtue of TLD's egregious overbilling and mismanagement of the cash calls and JIBs to purchase participation in other drilling projects. *Id.* at ¶ 42. Mann's ill-gotten gains allowed Mann to personally participate in these projects which proved to be lucrative to Mann and his other closely held companies. *Id.* at ¶43.

Mann chose Five Star to serve as the drilling contractor on this project because he knew that he would be able to control the actions of Five Star. *Id.* at ¶44. With absolutely no drilling knowledge or experience, Mann dictated the procedures to be followed by Five Star, much to the detriment of RPS. *Id.* Mann intentionally delayed completion of the well because Mann, personally and through his alter-egos, TLD (and, later, Cypress), earned significantly more money during the drilling of the well than they would have earned had Five Star successfully and properly performed its task. *Id.* Mann interfered with Five Star's obligations under the Drilling Contract and, through the direct instruction of Mann, TLD and Cypress, Five Star breached the express terms of the Drilling Contract which Mann executed on behalf of RPS. *Id.* Finally, when TLD and Cypress did not pay the Five Star invoices when they became due, RPS unknowingly breached its agreement with Five Star.

In **October 2019**, Mann ceased doing business as TLD. Mann formed Cypress at the same address as TLD – with the same employees, clients, ownership, management, and assets previously owned and served by TLD. *Id.* at ¶44. Mann again assured RPS that Cypress could fulfill the agency agreement previously entered into with TLD. *Id.* On **October 9, 2019**, Mann, individually, and on behalf of Cypress, required RPS to enter into a new contract titled "Land Service Agreement" with Cypress ("Cypress Agreement").[7] *Id.* at ¶45. Mann represented to RPS that he and his employees (formerly of TLD, now of Cypress) had the experience to continue obligations associated with operating the wells. *Id.* Based on these representations, RPS executed the Cypress Agreement. *Id.* At the time of the Cypress Agreement, RPS was unaware of the fraudulent and/or negligent accounting. *Id.* The parties entered into the new agreement with the

---

[7] Dkt. 53-4.

understanding and intent that Cypress would assume all duties, obligations, and responsibilities previously held by TLD prior to its cessation. *Id.*

Cypress acted as a continuation of TLD. *Id.* at ¶47. Cypress occupied the same office space, with the same employees and management, and performed all the same duties with the same responsibilities previously done and held by TLD, at the exact same billing rates previously charged by TLD. *Id.*

After executing the Cypress Agreement, Cypress began invoicing RPS's Trinity Bend Prospect Operator's Account for substantial amounts of money that were not related to operating the well on the Trinity Bend Prospect. *Id.* at ¶48. Specifically, Cypress invoiced the joint account for significant charges that were <u>not</u> used in drilling, reworking or plugging the well on the Trinity Bend Prospect. *Id.* Cypress continued TLD's ineffective and fraudulent billing practices, billing RPS several times for the same invoices, and requesting and accepting payments which were not owed by RPS. *Id.* at ¶49.

Mann, TLD, and Cypress failed to properly keep track of and account for expenses and invoices using COPAS Procedures, resulting in double and triple billings submitted to RPS, as well as unpaid overdue invoices from vendors that were unknown to RPS. *Id.* at ¶50. As a result of TLD's and Cypress's negligent and/or fraudulent billing practices, despite receiving full payment from RPS, TLD and Cypress did not pay the vendors for work performed. *Id.* at ¶51. TLD and Cypress failed to pay vendor invoices out of funds acquired from RPS. *Id.* Upon discovering the unpaid vendor invoices, RPS issued payment directly to the vendors and rectified the accounts. *Id.* Due to TLD and Cypress's faulty accounting, some accounts were beyond reconciliation. *Id.* As a result, several vendors filed suit against RPS. Consequently, RPS

incurred substantial litigation expenses – separate and apart from the funds paid to TLD and Cypress – in order to settle the various vendors' claims and lawsuits.

At Mann's direction, TLD and later Cypress received priority and preferential payment for their own invoices from RPS's operating funds, often at the exclusion of third-party vendor invoices.  *Id.* at ¶52.  Mann, TLD, and later Cypress concealed this priority payment system from RPS and misrepresented to RPS that the funds provided by RPS for payment to vendors were being allocated correctly.  *Id.*  Upon information and belief, funds paid to TLD and Cypress were diverted to other accounts by Mann for Mann's personal use.  *Id.* at 53.  Mann's business entities, TLD and Cypress, were merely alter-egos.  *Id.*  Mann used TLD and Cypress to divert funds for his personal use and to fund projects with other Mann-controlled entities.  *Id.*  For example, Mann used the funds improperly obtained to purchase an interests in other drilling project coordinated by RPS.  *Id.*

### III.
### SUMMARY OF THE ARGUMENT

Mr. Mann, TLD, and (later) Cypress, profited from their associations with Mr. Small and RPS.  Mr. Mann and his companies falsely proclaimed their abilities to act as operator's agents in order to maintain their lucrative association with RPS.  Lining their own pockets, TLD, (later) Cypress, and Mr. Mann each benefitted from their scheme to have RPS fund their endeavors.  In response to the Mann Defendants' latest motion to dismiss, RPS seeks leave to file a Fourth Amended Complaint (attached).  <u>The proposed Fourth Amended Complaint does not add any new causes of action; it merely removes those that RPS no longer wishes to pursue.</u>

Because RPS is dismissing its breach of oral agency contract claim, fraud and DTPA claims, sections I, II, and III of Defendants' Motion to Dismiss are rendered moot.  RPS will address only the remaining causes of action challenged by the Mann Defendants in their recent

Motion to Dismiss. Specifically, the Mann Defendants contend that RPS failed to state a claim for relief under Rules 9(b) and 12(b)(6) for its tortious interference (§IV) and alter ego (§V) claims, and that that RPS's breach of fiduciary duty, fraud by nondisclosure, and tortious interference claims against Mann are preempted by §21.223 of the Texas Bus. Org. Code.

Plaintiff's Complaint is replete with more than sufficient facts to provide fair notice of the basis of each alleged cause of action currently being asserted against each defendant, more than satisfying the requirements of the applicable Federal Rules. Further, these causes of action are not preempted. Defendants' Motion to Dismiss should be denied.

## IV.
## RULE 9(B) & 12(B)(6) STANDARDS

A complaint must be liberally construed in favor of the plaintiff, and all facts pled in the complaint must be taken as true. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003) (emphasis added); *Campbell v. Wells Fargo Bank*, 781 F.2d 400, 442 (5th Cir. 1986).

### A. FAIR NOTICE AND SPECIFICITY REQUIREMENT – RULE 9(B)

Federal Rule of Procedure 8(a)(2) provides that "[s]pecific facts are not necessary; the [allegations] need only 'give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)(per curiam)(emphasis added). Federal Rule of Civil Procedure 9(b) adds: "In alleging fraud or mistake, a party must state with particularity the *circumstances* constituting fraud or mistake." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)(emphasis added). The key issue for heightened fraud pleadings is "whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Town of Davie Police Pension Plan* 273 F. Supp. 3d, 650, 660 (N.D. Tex. 2017)(emphasis added). "'[A]lthough Rule 9(b) calls for fraud to be pleaded with particularity,

11

the allegations must still be as short, plain, simple, direct, and concise as is reasonable under the circumstances.'  Rule 9(b) should not be read so as to obliterate this basic pleading philosophy." *Frith v Guardian Life Ins. Co. of America*, 9 F.Supp.2d 734, 742 (S.D. Tex. 1998) (emphasis added)(quoting Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1291 (1st ed.1969)). "[I]t has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied."  *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998) (emphasis added).  RPS alleges that that the occurrences at issue are complex, involving a lengthy pattern of mishandling of funds and JIB accounting, mishandling of drilling the well, inflated charges, and accounting malfeasance.

RPS's claims allege that the Mann Defendants (individually Mr. Mann, TLD, and later Cypress) (*who*), submitted inflated invoices and falsely claimed competence in drilling wells (*what*) at their offices in Houston and at the Norma #1 well, usually over the telephone to RPS in Tulsa, Oklahoma (*where*) continuously from 2016 to the end of the Mann Defendants' role in the project (*when*), with the intent to induce Mann to enter into the agency agreements (*why*), then falsely overbilling and seeking reimbursement for their own shoddy work – always paying themselves first (*how*).

## B.   REQUIREMENT TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED – RULE 12(B)(6)

Federal Rule of Civil Procedure 12(b)(6) requires a plaintiff to state a claim upon which relief may be granted.  To survive a motion to dismiss, a plaintiff must merely plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570-72 (2007).  Courts accept "all well pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (emphasis added); *see Malina v. Gonzales*, 994 F.2d 1121, 1135 (5th Cir. 1993).

Unlike a motion for summary judgment, **a motion to dismiss should be granted** _**only**_ **when it appears** _**without a doubt**_ **that the plaintiff can prove** _**no**_ **set of facts in support of his claims that would entitle him to relief**.  *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)(emphasis added); *Home Builders Association of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998) (applying the standard in the context of Rule 12(b)(1)).  The United States Court of Appeals for the Fifth Circuit held that **dismissal for failure to state a claim is disfavored and will be appropriate only in** _**rare**_ **circumstances**.  *Mahone v. Addicks Util. Dist. Of Harris County*, 836 F.2d 921, 926 (5th Cir.1988)(emphasis added).

**V.**
**ARGUMENTS AND AUTHORITIES**

**A.      RPS P**LED **S**UFFICIENT **F**ACTS TO **S**UPPORT ITS **B**REACH OF **F**IDUCIARY **D**UTY AND **F**RAUD BY **N**ONDISCLOSURE **C**LAIMS **A**GAINST **M**ANN

Mann owed fiduciary duties to RPS by virtue of their long-standing confidential relationship of trust.  *Id.* at ¶16.

Mann entered into the Drilling Contract with Five Star on behalf of RPS, agreeing that RPS would pay Five Star the rates set forth in the Drilling Contract.  *Id.* at ¶19.  Mann owed RPS a fiduciary duty to ensure the rates in the Five Star Drilling Contract were competitive.  *Id.*  They were not.  *Id.*  TLD, at Mann's direction, then prepared the JOA which required RPS to ensure that all expenses and work performed were done at competitive rates.  *Id.*  Mann knew that the terms of the JOA were contrary to the terms of the Drilling Contract he had already obligated RPS to.  *Id.*  This was concealed from RPS.  *Id.*  This created tremendous conflict between RPS and the JOA participants such that the JOA participants refused to pay their portion of the expenses.  By agreeing to these increased rates, Mann placed RPS in the position of being contractually

13

obligated to Five Star at amounts it could not recoup from the JOA participants.  RPS was left to pay the full amount of the Five Star invoices (which are subject to a separate lawsuit with Five Star) because his partners in the project refused to pay Five Star's elevated rates.  Mann also intentionally interfered with and directed Five Star's performance for his personal benefit to the detriment of RPS.  *Id.* at ¶43.  Knowing that he, through his closely held alter-egos, TLD and later Cypress, would earn significantly more with each day that the completion of the well was delayed, Mann intentionally interfered with Five Star's contract and delayed Five Star's work to divert additional monies to TLD and Cypress.  *Id.* at ¶43.  Mann's involvement with Five Star was not in his representative capacity for TLD or Cypress but rather in his personal capacity as representative for RPS as evidenced by Mann's signature on the Five Star Drilling Contract.  Mann had a duty to disclose all these matters to RPS, but failed to do so.

Mann took advantage of his longtime personal and professional relationship of trust with Small and made false representations with the clear intent that RPS rely on the representations.  *Id.* at ¶17.  Mann took advantage of his relationship with RPS to engage in self-dealing and overbilling, and failed to inform RPS of same.  *Id.*  RPS pled sufficient facts to satisfy both Rule 9(b) and 12(b)(6) pleading requirements as to its breach of fiduciary duty and fraud by nondisclosure claims against Mann.  Defendants' motion to dismiss should be denied.

**B.      RPS Pled Sufficient Facts to Support its Claims Against Mann, TLD and Cypress for Tortious Interference with the Five Star Drilling Contract**

Defendants assert that the Mann Defendants cannot be held liable for tortiously interfering with the Five Star Drilling Contract because there is no allegation that they acted for their sole benefit.  Defendants' rely on *Weatherford Int'l LLC v. Binstock,* CV-H-19-4258, 2020 WL 1692543, at *8 (S.D.Tex. April 7, 2020) to suggest that RPS's claim against Mann should be dismissed because RPS failed to claim that Mann's actions were for his sole benefit rather than a

mixed motive.  Defendants' reliance is misplaced.  The mixed-motive referred to in *Weatherford* would require that <u>both</u> RPS and Mann benefitted from Mann's actions.  A corporate officer's mixed motives—to benefit both himself and the corporation—are insufficient to establish liability. *Id.* citing *Powell Industries, Inc. v. Allen*, 985 S.W.2d 455, 457 (Tex. 1998).  Further, in *Weatherford*, the Court held that Binstock (as an officer of Siteworks) could not be held liable for interfering with the contract between Siteworks and Weatherford <u>unless he acted outside the scope of his agency</u>.  *Id.*  That holding is inapplicable here, as shown below:

**<u>Allegations against Michael Mann</u>**:

> Mann intentionally delayed completion of the well because <u>Mann, personally and through his alter-egos, TLD (and later Cypress), earned significantly more money during the drilling of the well than they would have earned had Five Star successfully and properly performed its task.</u>  (¶43).

> Having gained the trust of Small and RPS, Mann used this trust <u>to benefit Mann</u> through self-dealing to the detriment of RPS.  (¶64).

> Mann utilized his personal and business relationship with Small and RPS to commingle funds and self-deal <u>for the benefit of Mann, and his companies</u>, including TLD, Cypress and RAM Energy, LLC.  (¶65).

> Mann set out to gain the trust of Small and RPS and used this trust to <u>benefit Mann</u> through self-dealing to the detriment of RPS.  (¶70).

> These surplus funds were used by <u>Mann for his personal benefit</u>.  (¶94).

> Mann committed fraud when funds improperly obtained by TLD and Cypress from egregious overbilling, cash calls or JIBS were deposited into other accounts over which Mann exercised control and were <u>used by Mann for his personal benefit</u>.  (¶97).

> <u>Mann's practice of dictating the work performed by Five Star, to delay completion of the well for his personal benefit</u>, and in direct breach of the Drilling Contract and the JOA, proximately caused RPS's injuries described herein above and caused actual financial and reputational damage to RPS.  (¶119).

> Mann treated TLD and, later, Cypress as alter-egos <u>for his personal benefit</u> and has directed the employees of TLD and Cypress to engage in various activities solely for the personal benefit of Mann.  (¶126).

Thus, Michael Mann executed the Five Star contract in his personal capacity on behalf of and as an agent for RPS.  Mann's actions in directing Five Star's work to RPS's detriment was outside the scope of his agency and benefitted Mann– not RPS.  The *Weatherford* opinion does not preclude RPS's tortious interference claims against Mann.  Mann acted outside the scope of his agency and for his benefit to the exclusion of RPS.  Unbeknownst to RPS, Mann chose Five Star specifically so he could dictate Five Star's actions to the detriment of RPS for the sole benefit of Mann and his closely-held companies.

As described in RPS's Complaint:

Mann chose Five Star to serve as the drilling contractor on this project because he knew that he would be able to control the actions of Five Star.  With absolutely no drilling knowledge or experience, Mann dictated the procedures to be followed by Five Star, much to the detriment of RPS.  Mann intentionally delayed completion of the well because Mann, personally and through his alter-egos, TLD (and, later, Cypress), earned significantly more money during the drilling of the well than they would have earned had Five Star successfully and properly performed its task.  Mann interfered with Five Star's obligations under the Drilling Contract and, through the direct instruction of Mann, TLD and Cypress, Five Star breached the express terms of the Drilling Contract which Mann executed on behalf of RPS.[8]

Further, Mann concealed information from RPS and acted in his own self-interest.[9]

Mann breached his formal fiduciary duties, as an agent, to RPS by entering into and supervising the Drilling Contract with Five Star.  In supervising Five Star, Mann placed his own interests above those of RPS.  Mann's closely held companies stood to gain significantly more money with each delay of the Drilling Contract, many of which were dictated by Mann.  Mann's actions breached his fiduciary duties to RPS.[10]

Mann's practice of dictating the work performed by Five Star, to delay completion of the well **for his personal benefit**, and in direct breach of the Drilling Contract and the JOA, proximately caused RPS's injuries described herein above and caused actual financial and reputational damage to RPS.[11]

---

[8] *Id.* at ¶ 43; see also 71.
[9] *Id.* at ¶ 63.
[10] *Id.* at ¶ 71.
[11] *Id.* at ¶119.

16

RPS plead more than sufficient facts to establish that Mann acted outside the scope of his authority, concealed his actions from RPS, and acted for his sole benefit.  Michael Mann knew that by delaying completion of the well, and increasing costs to RPS, he was interfering with Five Star's duties under the contract.  In cannot be disputed that excessive, increased costs to RPS – for which RPS could not obtain contribution from the JOA participation – served to benefit only Mann at the expense of RPS.  Thus, RPS's tortious interference claim against Mann is valid.

**TLD and Cypress**

Similarly, TLD and Cypress tortiously interfered, for the sole benefit of the Mann Defendants, with the contracts they drafted and/or executed as agents for RPS.  TLD drafted the JOA, which dictated RPS's accounting duties and obligations to the non-operators.  Despite intimate awareness of the RPS's duties (by virtue of drafting the agreement) TLD and later Cypress submitted (and later, on behalf of RPS, paid) their *own* invoices that they knew failed to comply with JOA requirements.  TLD and Cypress interfered with RPS's JOA contract with the non-operators each time TLD and Cypress submitted and paid their own fraudulent invoices and duplicate cash calls, failed to reconcile JIBs, and failed to timely pay vendors.  TLD and later Cypress also failed to comply with the agreed-upon monetary distribution requirements set forth in the JOA.  These acts of non-compliance and money misallocation were deliberately concealed from RPS. (¶52).  Through their actions, RPS unknowingly breached its obligations under the JOA.  These actions by TLD and Cypress were outside the scope of authority as agents of RPS, and were done for the sole benefit of the Mann defendants.  RPS did not benefit from these actions.  As a result of the Mann Defendants' self-serving behaviors, several of the JOA participants refused to remit their proportionate share of payment, which resulted in RPS incurring significantly more of the costs operation.

17

Similarly, RPS pled facts sufficient to establish that TLD (and later Cypress) tortiously interfered with various vendor contracts when they failed to pay vendors.  Mann, TLD, and Cypress executed various vendor contracts on behalf of RPS whereby RPS was obligated to pay for services rendered.  TLD and Cypress submitted these vendor invoices to RPS for payment. RPS timely remitted payment to TLD and Cypress for every invoices.  TLD and Cypress, with the knowledge of and at the direction of Mann, used those funds instead to pay TLD's and Cypress's invoices.  TLD and Cypress also diverted those funds for their and Mann's personal benefit.  These actions were outside the scope of the agency agreements and were concealed from RPS.  By not paying the vendors and actively concealing the true facts from RPS, TLD and Cypress placed RPS in breach of the vendor agreements.  Accepting payment from RPS for vendor invoices but then diverting those funds to their separate accounts was outside the scope of their authority, and solely benefitted the Mann Defendants.  There was no "mixed motive" – RPS received no benefit from these actions.  Upon discovering the unpaid vendor invoices, RPS issued payment directly to the vendors and rectified the accounts.  Due to TLD's and Cypress's faulty accounting, some accounts were beyond reconciliation.  As a result, several vendors filed suit against RPS.  Consequently, RPS incurred substantial litigation expenses – separate and apart from the funds paid to TLD and Cypress – in order to settle the various vendors' claims and lawsuits.  (¶50).

As described above, RPS alleged that Mann acted for his sole benefit when he interfered with the Five Star Drilling Contract. Mann's duties to RPS related to the Five Star Drilling Contract are owed in his personal capacity.  There is no allegation of mixed motive.  Mann's actions benefited Mann alone.  There was no benefit to RPS.

Similarly, as for the other contracts (the JOA and those with vendors who RPS agreed to pay and who RPS remitted money to TLD and Cypress to pay but to whom payments were not made because the funds were diverted to the Mann Defendants) – again, there was no "mixed motive." The Mann Defendants were the only beneficiaries to their unauthorized actions. Mann used the funds obtained by virtue of TLD's egregious overbilling and mismanagement of the cash calls and JIBs to purchase participation in other drilling projects. (¶42). Mann's ill-gotten gains allowed Mann to personally participate in these projects which proved to be lucrative to Mann and his closely held companies. (¶42). Defendants' motion to dismiss RPS's tortious inference claims against Mann, TLD, and Cyprus should be denied.

**C.     RPS PLED SUFFICIENT FACTS TO SUPPORT ITS ALTER EGO CLAIMS AGAINST MANN**

The Mann Defendants cite no law which holds that a Plaintiff must demonstrate all elements of an alter ego claim at the pleadings stage, relying instead on summary judgment cases. RPS has more than met the pleading requirements to satisfy Rule 9(b) and 12(b)(6) and alleged when, how, and where the facts supporting the alter ego claims occurred.

**When**:  Michael Mann treated TLD and Cypress as his alter egos during the period from the execution of the TLD Agreement until RPS uncovered the Mann Defendants' fraud, fired the Mann defendants from the Norma #1 well project, and filed this lawsuit. (¶¶124-127)

**How**:  Mann used TLD and Cypress to divert funds from the Trinity Bend Prospect to other accounts for which Mann had banking authority. (¶¶53). Funds were diverted from TLD and Cypress to Mann for his personal use. (¶65). Mann, TLD and Cypress comingled funds from the Trinity Bend Prospect with those for Mann's other business ventures. (¶¶40, 41, 125). Mann, TLD and Cypress ensured that Mann's closely held companies received priority payment of its overbilled invoices. (¶52). Mann used the monies improperly received to fund his participation in other drilling projects. (¶42) RPS also alleged:

19

124.    Mann completely dominated and controlled TLD and, later, Cypress such that neither entity has/had a legal or independent significance on its own.

125.    Mann dictated the actions taken by TLD and, later, Cypress and comingled funds paid to TLD and Cypress with his personal funds as well as those of other entities controlled by Mann.

126.    Mann treated TLD and, later, Cypress as alter-egos for his personal benefit and has directed the employees of TLD and Cypress to engage in various activities solely for the personal benefit of Mann.

127.    Mann has used funds wrongfully obtained by TLD and Cypress by virtue of their respective improper billing practices to fund the participation in other drilling projects outside the Norma #1 well (see ¶53).

**Where**:  These actions were performed at Mann's Houston offices and at on-site at the

Trinity Bend Prospect. (¶15, ¶94).

Since RPS fully met the pleading requirements of Rule 9(b) for its alter-ego claims,

Defendants' motion to dismiss on this point should be denied.

**D.    SECTION 21.223 DOES NOT APPLY TO MANN'S ACTIONS TAKEN IN HIS PERSONAL CAPACITY**

RPS's breach of fiduciary duty and tortious interference claims against Mann are

unaffected by §21.223 of the Tex. Bus. Orgs. Code.  This statute bars claims against the owner of

a company that are based on *actions taken by the owner on behalf of a company*.  While this may

provide protection to Mann for certain actions he took on behalf of TLD and Cypress, they do not

affect Mann's liability for actions taken in his *personal capacity*.  RPS's breach of fiduciary duty

and tortious interference claims against Mann relate to actions Mann took in his individual capacity

for his personal gain.  Contrary to Defendants' assertion, RPS's breach of fiduciary duty claim

against Mann has nothing to do with Mann's role as the owner or President of TLD or Cypress,

nor does the claim relate to RPS's contract with either of Mann's closely held companies.  The

claim also does not relate to "having TLD and Cypress enter the Five Star Contract," as that

allegation was never made. (*See* Dkt. 55 p.19).  TLD and Cypress were not involved in the Five

Star contract.   <u>Mann executed the Five Star contract in his *personal* capacity – not as a representative of either TLD or Cypress</u>.  (¶¶19-20; Dkt. 53-2).  Mann breached his fiduciary duty to RPS and tortiously interfered with the Five Star Contract – doing both for his personal benefit. As stated in ¶43 of the Complaint:

> Mann chose Five Star to serve as the drilling contractor on this project because he knew that he would be able to control the actions of Five Star.  With absolutely no drilling knowledge or experience, Mann dictated the procedures to be followed by Five Star, much to the detriment of RPS.  Mann intentionally delayed completion of the well because Mann, personally and through his alter-egos TLD (and later Cypress), earned significantly more money during the drilling of the well than they would have earned had Five Star successfully and properly performed its task.

> Mann is not shielded from personal liability for his actions taken in his personal, individual capacity.  Section 21.223 is not applicable to, and therefore does not preempt, RPS's breach of fiduciary duty and tortious interference claims against Mann personally for his actions related to Five Star.  Defendants' motion to dismiss on this point should be denied.

## CONCLUSION

The Court should not dismiss RPS's current claims at this pleading stage because RPS's pleadings, *taken as a whole,* more than sufficiently pled the "who, what, when, where and how" to satisfy Rule 9(b)'s fair notice standards as well as the more lenient requirements of Rule 12(b)(6).  RPS respectfully requests permission to file the proposed Fourth Amended Complaint, that the Mann Defendants' Motion to Dismiss (Dkt. 34) be denied, and all other just relief.

Dated: March 8, 2021                                  Respectfully submitted,

                                       */s/ John Wesley Raley*
                                      John Wesley Raley
                                      Texas Bar No. 16488400
                                      Robert M. Bowick
                                      Texas Bar No. 24029932
                                      Tanya Dugas Dawson
                                      Texas Bar No. 24072076
                                      **RALEY & BOWICK, LLP**

1800 Augusta Drive, Suite 300
Houston, Texas 77057
713-429-8050 (telephone)
713-429-8045 (facsimile)
Email: jraley@raleybowick.com
        rbowick@raleybowick.com
        tdawson@raleybowick.com

**ATTORNEYS FOR PLAINTIFF**
**R. P. SMALL CORP.**

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of this Response to Motion to Dismiss was served on all counsel of record through the Court's ECF/PACER filing system on March 8, 2021.

*/s/ John Wesley Raley*
**John Wesley Raley**